Nanette Dembitz, J.
Petitioner, the divorced wife of respondent, petitioned for an upward modification of the child support provided in a divorce decree granted by the New York State Supreme Court in 1971, alleging the child’s increased needs. Respondent then cross-petitioned for a downward modification of both the child support and the alimony provided in the 1971 decree; he alleged a drastic decrease in his financial resources and that petitioner, though not employed at the time of the decree, is now employable. The court concludes that increased child support is warranted by the child’s needs and respondent’s means. However, a reduction of alimony will be directed on the basis of petitioner’s employability.
Respondent’s argument of decreased means since entry of the divorce decree, presents a novel question as to the proper application of the rule permitting downward modifications on that basis, when the decree was entered without judicial consideration of respondent’s means. Other issues of law herein are whether the child support order should include private academic school and also religious school tuition, despite the constitutional prohibition on State aid to religion; whether respondent’s capital, as distinguished from income, should be a factor in determining increased child support; and the relevance of petitioner’s employability.
1. Proper Application of Rule of Changed Circumstances
Sections 461 and 464 of the Family Court Act provide, codifying common-law doctrine, that this court "may entertain an application” for modification of a matrimonial decree on the ground of "changed circumstances”. Respondent argues that a downward modification of the 1971 divorce decree is warranted in that his income from his two business enterprises was in 1971 over $90,000, and in 1974 as well as 1973, only $35,400 (figures are stated herein to the nearest hun *913 dred). Petitioner contends, however, that respondent’s present circumstances should be compared with his circumstances in 1967 when his income from his businesses was a low of $29,000 (his income after taxes being $24,700 in 1967 and $33,600 in 1974.)
Petitioner’s contention is grounded on the fact that her present alimony of $150 a week (plus respondent’s payment of petitioner’s taxes thereon) and child support of $75 a week, as provided in the 1971 divorce decree, were first ordered in a Massachusetts separation decree dated June, 1968. The minutes of the Massachusetts court show that its decree was based on evidence as to needs and means, including respondent’s 1967 tax return. By contrast, the 1971 conversion divorce decree was based on an informal agreement by counsel, accepted by the New York court without any review of the circumstances, to continue the Massachusetts support awards, plus a maximum of $1,500 yearly for private school and religious training for the child, a maximum of $1,000 yearly for his summer camp after the age of 8, and insurance for the child’s benefit. For reasons stated below, the decrease in respondent’s income since the 1971 decree does not, in this court’s opinion entitle him to a reduction of the decreed amounts.
Petitioner’s attorney in the divorce proceedings had been given profit-loss statements for respondent’s companies, which indicated that his 1971 income was over $90,000. There is no evidence as to why the then-attorney for petitioner (who was the defendant in the conversion divorce proceeding) agreed to the weekly support figures that had been fixed when respondent’s income was less than half as much. Possibly, though a prominent matrimonial attorney, he erroneously felt bound by the alimony awarded in the separation decree; the Court of Appeals had not yet decided Kover v Kover (29 NY2d 408) in which the high tribunal for the first time upheld Appellate Division decisions that a court granting a conversion divorce after a separation decree may make a de novo alimony determination. Whatever the reason for his agreement (and reasons for an agreement are various: cf. Matthews v Schusheim, 35 NY2d 686), the question is whether this court must view the base circumstances for the purpose of determining whether respondent’s present income justifies a reduction of support, as the circumstances that in fact existed and were known to petitioner’s then-attorney at the time of the divorce decree.

*914
Rationale of Rule as to Changed Circumstances

Because of the principle that "a court, having performed its function, may not lightly be asked to do it all over again” (Kover, 29 NY2d, at p 413), a court must assume the reasonableness of a previous support decision and, in considering modification, compare the present circumstances with those evident in the findings or record of the prior proceedings. (See, e.g., Levene v Levene, 165 App Div 953; Zeitz v Zeitz, 262 App Div 750, 751.) When the decree is based on an agreement rather than judicial findings, the modifying court, recognizing the force of an agreement and that it "was at least impliedly approved by the divorce court” (McMains v McMains, 15 NY2d 283, 286), may view the base circumstances, to be compared with the present ones, as those in contemplation of the parties at the time of the agreement. (See Swartz v Swartz, 43 AD2d 1012, 1014.)
That practice is not compelling here however, since the divorce court’s minutes reflect no formal agreement (cf. Gullo v Gullo, 46 AD2d 991). Further, petitioner’s acceptance in 1971 of the prior alimony figure despite respondent’s increased income, cannot be construed as an agreement to its reduction when his income, though diminished, continues to be greater than it was at the time such alimony was fixed by the separation decree. Finally, to use respondent’s 1971 income as the base circumstance would from one aspect derogate from the principle of respect for a prior judicial determination. For, alimony judicially fixed in the contested Massachusetts proceeding as commensurate with respondent’s 1967 income would thereby in effect be treated as commensurate with his doubled income in 1971. The Massachusetts court had paid particular regard to respondent’s 1967 income, reducing its temporary support order after respondent submitted his 1967 tax return.
In the leading case,of a downward modification because of the divorced husband’s decreased income since the divorce, the court indicated its assumption that the decreed amount, while incorporated from a separation agreement, had been commensurate with the husband’s actual income at the time of the decree. (Goldman v Goldman, 282 NY 296, 299.) Nor does there appear to be any case of reference to a year’s income as the base circumstance where, as here, the decreed alimony clearly was not fixed in relation to respondent’s income for that year.
*915 The rule of changed circumstances — a procedural adjunct to the substantive principle of support obligations commensurate with a respondent’s means — cannot be applied arbitrarily, to defeat that principle. For the foregoing reasons neither the actuality of respondent’s high 1971 income nor the petitioner’s attorney’s knowledge of it nor the entry of the divorce decree in 1971, is persuasive that petitioner’s alimony should be reduced because of respondent’s decreased income since 1971. While respondent’s changed circumstances since the decree gives the court jurisdiction to consider its modification, the discretionary relief of a reduction of alimony on that ground is denied.
As to respondent’s petition for a downward modification of child support, it is even clearer than in the case of petitioner’s alimony that his application must be rejected. The divorce court did nothing but accept an informal agreement on child support; and a child is in no way bound even by a formal agreement. (Van Dyke v Van Dyke, 305 NY 671, affg 278 App Div 446.) Indeed, the court has jurisdiction and discretion to increase decreed child support not only in the face of an agreement but even in the absence of a change of circumstances. (See Langerman v Langerman, 303 NY 465, 468; 203 Misc 230.)[1]
2. Child’s Private Academic School and Religious School Tuition
A child’s private-school tuition can, under section 416 of the Family Court Act, be included in a support order when appropriate "in the light of respondent’s pecuniary ability.” (Matter of Kotkin v Kerner, 29 AD2d 367, 368, 369. See also Hahn v Hahn, 40 AD2d 624, 625; Matter of Hahn v Hahn, 78 Misc 2d 585, 586-587, affd 44 AD2d 913; Prospero v Prospero, 39 AD2d 634, 635; Matter of Matthews v Matthews, 14 AD2d 546.) Respondent’s 1971 agreement demonstrates his acceptance of the appropriateness of private school for the child, and he does not question the desirability of the child’s continuance at his present school. On that ground Matter of G. v G. (42 AD2d 555) upholding a father’s refusal to pay for tuition, is clearly distinguishable.
*916 As to religious school tuition, it is true that an order for its payment constitutes State assistance to religion and poses an issue of constitutionality under the First Amendment’s Establishment Clause. (See Lemon v Kurtzman, 403 US 602, 612; consider Shelley v Kraemer, 334 US 1, 19.) However, the child’s religious school attendance accords with the wishes and religious preference of both parents and of the child. While this 8-year-old child’s religious inclination is undoubtedly determined by his parents’, State cognizance of their preference is constitutional. (See Wisconsin v Yoder, 406 US 205, 231; Zorach v Clauson, 343 US 306, 311.) Further, continuance in religious school is under the circumstances of the child’s life conducive to his well-being. An order to pay tuition there is in the instant context constitutional as a measure primarily purposed to advance a child’s welfare. (Cf. Everson v Board of Educ. 330 US 1, 17; Tilton v Richardson, 403 US 672.)
On the findings and conclusions stated below, the court finds that from the standpoint of respondent’s means his payment of the child’s increased academic school and religious school tuition is appropriate.
3. Child Support Commensurate With Respondent’s Means and Standard of Living
A. Respondent’s Means: Personally-Owned Corporations
Respondent works in two business enterprises organized as personally-owned corporations, of which he and his brother are co-owners: Allied Heel Company, Inc. and Keiter Sales Company, Inc. Appraising respondent’s means presents the difficulties frequent in cases involving personally-owned corporations, for respondent together with his co-operating co-owner can exercise control for his own advantage over the timing, extent, and form of corporate disbursements to him. (See, e.g., Bittson v Bittson, 138 NYS2d 294, 296-297; Schacht v Schacht, 187 Misc 461, 467-468; Matter of Kern v Kern, 65 Misc 2d 765, 776.)
Respondent contends that of the income he reported on his 1974 tax return of $41,300, only $30,000 should be considered actual "economic” income; he testified that $11,000 of his reported income from his corporations was received in the form of their cancellation of his indebtedness to them. However, respondent did not indicate when the claimed indebtedness was incurred, nor of any consideration given, or any *917 reason for its cancellation in 1974. Nor did he disclose whether his 1974 cash-flow included loans to him from the corporations (which of course would not be reported for income tax purposes), although loans between respondent and the corporations were clearly a continuing mechanism. The corporations’ continuing capacity to make loans to respondent —despite his emphasis herein on their declining fortunes — is not precluded by their 1974 balance sheets which showed: Allied Heel’s net worth of $278,700, earned surplus of $180,300, and ratio of current assets to current liabilities of more than 2 Yi to 1; Keiter Sales’ net worth of $74,100, surplus of $63,100, and ratio of current assets to current liabilities of more than lYi to l.[2] No financial stringency is indicated by their continued rental for respondent’s use of a Cadillac car at a cost of $375 a month as well as by his other fringe benefits.
Considering these facts, the pendency of the instant litigation in 1974, and respondent’s control of the form and amount of corporate payments to him (see Matter of Meyrowitz v Meyrowitz, 34 AD2d 965, 966), the court can neither accept respondent’s contention as to the amount of cash available to him from his corporations in 1974, nor make any finding as to such amount. It is to be noted that the Massachusetts court had difficulties in 1968 in determining respondent’s means similar to this court’s in the case at bar; despite respondent’s representation to the Massachusetts court that $6,200 of his 1967 reported income was a "non-recurring distribution of partnership assets” and that his income had declined since 1966 to a weekly net of only $186.31, that court awarded support of $225 a week.
The court will not attempt to estimate respondent’s 1975 income in view of the fragmentary information available about it. And, in part because respondent indicated no intention of liquidating Allied Heel, the court must disregard his estimate of his reduced net worth for 1975, based on the resale value of Allied Heel’s machinery.
Even assuming arguendo the truth of respondent’s claim of an "economic” income of only $30,000 in 1974, the court finds, *918 for reasons stated below, that the increased child support herein ordered is warranted by respondent’s means, considering his individually-owned liquid assets.
B. Respondent’s Means: Capital
As of June 1975, respondent’s balance in his personal bank account was $23,900; he also held $23,000 in short-term paper and stocks in publicly-owned corporations with a market value of $78,000. Undoubtedly "any and all assets which are or might be at the disposal of the respondent” may be considered in determining support (Matter of Chapman v Chapman, 28 AD2d 1028), particularly if they are "comparatively liquid” (Bittson v Bittson, 138 NY Supp 2d 294, 296, affd 285 App Div 1061. See, also, Tirrell v Tirrell, 232 NY 224, 228; Swartz v Swartz, 43 AD2d 1012, 1014; Slocum v Slocum, 42 AD2d 56, 58; Brownstein v Brownstein, 25 AD2d 205, 208; Levine v Levine, 57 Misc 2d 978, 981; Rosenzweig v Rosenzweig, 145 NYS2d 810, 811). This principle, well-established in the cited cases involving alimony, applies a fortiori to child support (Matter of Kern v Kern, 65 Misc 2d 765, 770; Matter of Sullivan v Sullivan, 55 Misc 2d 691, 693) — a more fundamental and absolute obligation than alimony (see Langerman and Van Dyke cited above; as to alimony, see McMains v McMains, 15 NY2d 283, 288; Eisen v Eisen, 48 AD2d 652, 653).
It is especially appropriate to consider respondent’s liquid assets in determining child support, for the court finds, as petitioner contends, that respondent’s business profits fluctuate (judging from all the years on which there is evidence herein). Thus, respondent’s 1967 income after taxes declined to $24,600 from $58,000 in 1965 and $37,000 in 1966 (according to his representations to the Massachusetts court in 1968); rose to $56,000 in 1970; reached a new high in 1971; and his gross adjusted income declined to $41,400 in 1973 and 1974. (Regardless of "poor” years, Allied Heel showed in December, 1974 a substantial earned surplus accumulated over the years.) A fluctuating business was also indicated by respondent’s reference in March, 1973 (in refusing to increase child support) to the adverse effect of "imports and style changes” on his business, although in the instant proceeding he asserted that his business began to decline at the end of 1973.
Certainly it is appropriate for a father to maintain his son on a standard of living commensurate with his average means over the child’s early years, even though in a particular year *919 he may be required to dip slightly into substantial liquid assets to do so. The alternative — rapid changes in the child’s standard of living — would be highly detrimental, particularly if he were pulled in and out of private academic school and religious school with every fluctuation in the father’s income. Nor would such a pattern emulate that of the intact family; a support order is to serve that objective, for the father "did not divorce his child” (Laumeier v Laumeier, 237 NY 357, 364. See Herbert v Herbert, 198 Misc 515, 517; Cf. dissent in Matter of Kotkin v Kerner, 29 AD2d 367, 372).
C. Respondent’s Standard of Living
A child’s "need” is a flexible concept, and a father is obligated to provide a standard of living for his child like that he himself enjoys. As long ago as 1868 it was established that a father "is bound to provide for [his children’s] * * * maintenance, according to his and their situation and condition in life” (Keller v Phillips, 39 NY 351, 354); "those things might properly be deemed necessaries in the family of a man of generous income or ample fortune which would not be required in the family of a man whose earnings were small and who had saved nothing.” (De Brauwere v De Brauwere, 203 NY 460, 464-465). Respondent’s own standard of living is reflected in such items as his full-time use for pleasure as well as business of a Cadillac car at a rental of $375 a month; his membership throughout 1974 in a "country club”; maintenance of an insurance trust for his son in the amount of $90,000 and of a separate life insurance policy for $85,000 (although he was obligated by the divorce decree to provide a policy for the benefit of his son of only $35,000).
As a separately-filed finding shows, the expense of maintaining the child’s middle-class standard of living (provided by the original support order) has increased to $100 a week. The court finds that such standard is similar to respondent’s own; and that the payment of that weekly amount plus the child’s increased school tuitions is commensurate with respondent’s means.
The fact that petitioner has been providing in some fashion for the child’s increased expenses without appropriate aid from respondent, of course does not relieve respondent of his obligation. (See Laumeier v Laumeier, 237 NY 357, 364, supra; Matter of Kotkin v Kerner, 29 AD2d 367, 370, supra [state *920 ment of facts in dissent]; Barclay v Marston, 204 Misc 656, 658.)
4. Respondent’s Remarriage
A Massachusetts court has recently issued a temporary order directing respondent to pay $2,400 a year support for his second wife from whom he is now separated. Presumably that court would take into account in its final order the increased child support herein directed. In any event, it is clear that respondent’s second marriage does not affect his obligation to maintain for the child of his first marriage the standard of living that was theretofore established as commensurate with his means.
In Matter of Windwer v Windwer (33 NY2d 599, affg 39 AD2d 927, 928) the court upheld the ruling that the duty to pay alimony and child support arising from a first marriage stood unchanged even by the obligation to "a child born of the remarriage”. (Windwer accords with the rule in other jurisdictions. See Ann 89 ALR2d 110.) Certainly this principle applies pre-eminently to child support, as distinguished from alimony, and a fortiori to the case of a childless remarriage like the instant one, for the parties to it must be deemed aware of a father’s continuing responsibility to his pre-existing child to majority (although an alimony obligation may be extinguished or decreased by various circumstances).
Accordingly, respondent’s remarriage does not affect his means for the purposes of the instant case, nor his obligation to pay the increased cost of maintaining the child’s pre-existing standard of living.
5. Reduction in Alimony Due to Petitioner’s Employability
Respondent contends that petitioner terminated her last employment for the purposes of the instant litigation. A report from petitioner’s last employer (introduced by respondent) supports petitioner’s contrary testimony that the termination of her work was not so timed, and that her job ended for reasons beyond her control; the court so finds. Nevertheless, a separated or divorced wife is to be "encouraged * * * to devote her energies to their full reach to make herself eco *921 nomically useful.” (Brownstein v Brownstein, 25 AD2d 205, 209. See, also, Kover v Kover, 29 NY2d 408, 416.) Her earnings or potential earnings warrant a reduction in alimony except for special circumstances, which do not here exist. (Cf. Klein v Klein, 47 AD2d 855 [reduction] with Swartz v Swartz, 43 AD2d 1012 [no reduction].)
Petitioner, a youthful and apparently vigorous woman, lived with her husband for only a brief period some years ago; she apparently has the capacity, and has had ample time, to adjust her way of living towards the goal of employment. While petitioner was unemployed at the time of the hearing, to avoid further court appearances a reduction of alimony will be ordered on the basis of her potential earnings. (See order in Anonymous v Anonymous, 47 AD2d 853.)
Petitioner worked in her 1973-74 job, and prefers to work, only part-time in order to attend to her 8-year-old son’s needs after school. It is reasonable in view of respondent’s means and standard of living for his child to enjoy continued care by his mother and for respondent to contribute to petitioner’s support on the basis of her working only part-time. (Indeed, the difference between her part-time and her possible full-time earnings may be viewed as an aspect of child support.) On the basis of petitioner’s 1973-74 employment, this court finds that $35 a week is a reasonable estimate of petitioner’s potential earnings for part-time work (deducting a reasonable amount for work-related expenses), and her alimony will be reduced by that amount.
Respondent showed that petitioner’s deposits in her checking and savings accounts for 1973 exceeded respondent’s payments to her by $6,600. While some of these deposits represent transactions back and forth between her savings and checking accounts, it does appear that funds are available to her besides respondent’s payments or her wages. However, the court’s information in regard thereto is too scanty to permit any conclusion.
On the basis of the foregoing findings and conclusions and a separate finding as to the child’s weekly needs, the respondent is directed to pay $115 per week as alimony; $100 per week for child support; and annually $2,675 for the child’s private academic school expenses and $276 for his religious school.

. Nor could the agreed child support have represented the parties’ considered judgment of the maximum commensurate with respondent’s 1971 income, since his present payments equal only $29 a week over that decreed in 1968.

. Allied Heel’s 1974 net loss of $9,000 is to be viewed in relation to a deduction from income for depreciation of $42,400, bringing Allied’s depreciation reserve to a total at the end of 1974 equal to 69% of the value of its fixed depreciable assets. Keiter Sales showed a 1974 net profit of $4,000, after a deduction for depreciation of $19,100 (the deduction for 1970, the only other year for which a profit-loss statement was submitted, being only $137).